UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SHAMEL WILLIAMS

                  Petitioner,

**MEMORANDUM & ORDER**

-against-

04 CV 1286 (RJD)

ROY A. GIRDICH,

                  Respondent.
----------------------------------------------------------------X
DEARIE, Chief Judge.

      Petitioner, at age sixteen, was convicted of second-degree robbery and second-degree murder in connection with a 1996 armed robbery of a Brooklyn social and illegal gambling establishment during which a patron was murdered. The victim died from multiple gunshot wounds, including three in the area of his head, with one bullet perforating his brain.

      Petitioner was read his <u>Miranda</u> rights after eight hours in custody and then confessed to being a participant in the robbery but not the shooter. He specifically admitted his role in planning the robbery and in helping procure the eventual murder weapon, a MAC-11 pistol. His statement, first transcribed by the interrogating police officer and then videotaped by the district attorney, was the principal evidence at trial.

      Petitioner was sentenced to the minimum fifteen years to life on the murder conviction to be served concurrently with five to ten on the robbery. The court found that although petitioner was "a willing participant" in the crime, he "did in fact try to dissociate [him]self with it once it got out of hand," so the court could be "somewhat more lenient" with petitioner than with his co-defendant. S. 10.

Having exhausted his state remedies, petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the application is denied and the petition is dismissed.

I.

Petitioner's challenge to the admission of a statement he made to the police before he was read his Miranda rights does not provide a basis for habeas relief because the statement, although given while he was in custody, was not the product of "interrogation" as defined by the Supreme Court. See Rhode Island v. Innis, 446 U.S. 291, 300-02 (1980) ("interrogation" refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response").

The hearing court credited the testimony of Detective Kent Arthur, the sole witness at the pre-trial suppression hearing. Arthur "asked the subject if he knew why he had been brought in," petitioner responded by saying he did not know, and Arthur then "told him murder, the one at the social club," to which petitioner replied, "oh, man, that was a long time ago." H. 57, 172-75. Assuming without deciding that this seemingly benign statement was "incriminating" for purposes of Innis,[1] there is no reason to disturb the conclusion of the hearing court, affirmed by the Appellate Division, that petitioner's remark was an admissible spontaneous utterance and not the product of an "interrogation." H. 174; People v. Williams, 756 N.Y.S.2d 500 (App.Div. 2003). The fact that petitioner made the statement from his cell immediately following—and

---

[1] An "incriminating response" is "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." Innis, 446 U.S. at 301 n. 5 (emphasis omitted). The People did introduce the statement "oh man that was a long time ago" at trial, not merely as background, and referred to it twice during summation. T. 367, 380.

2

thus in apparent response to—the remarks of a police officer does not make the statement the product of an interrogation. See Innis, 446 U.S. at 300 ("'[i]nterrogation,' as conceptualized in the Miranda opinion, must reflect *a measure of compulsion above and beyond that inherent in custody itself*") (emphasis added); United States v. Isasi, 176 Fed. Appx. 143, 144-45 (2d Cir. 2006) (statement made while suspect in custody, handcuffed, and surrounded by law enforcement personnel in Mexican police station not involuntary; detective told suspect he knew suspect's real name and what had happened, but suspect's "reply" held to be spontaneous, not triggered by detective's remarks); United States v. Hernandez, No. 06 CR 46, 2006 WL 2242318, at *5 (S.D.N.Y. Aug. 3, 2006) (fact that law enforcement agents confronted suspect with proof of falsity of his earlier account and "thus provoked his admission" did not make the confrontation "coercive" or "render his statements, made within minutes of the institution of questioning, involuntary").

II.

Petitioner's challenge to the admission of his post-Miranda confession likewise does not provide a basis for habeas relief.

The suppression court announced the following as its findings of fact: at about 1:30 a.m., petitioner "was read his Miranda warnings. He signed it. . . . And then [a] two-page statement was prepared by the detective after [petitioner] narrated his involvement or lack of involvement in the incident." H. 168. Petitioner "was read the statement, given an opportunity to read it on his own and then signed it." H. 168-69. Thereafter the assistant district attorney took a video statement. H. 169. Petitioner also "had an opportunity to sleep prior to and after the lineup" that

occurred at about midnight. H. 169, 167.[2] These findings are presumed correct. 28 U.S.C. § 2254(e)(1) ("[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct"). Because they are amply supported by Detective Arthur's testimony, see H. 48-51, 53, 56-9, they are also conclusive here. Miller v. Fenton, 474 U.S. 104, 110, 117 (1985) (although "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination" by a habeas court, state-court findings on "subsidiary [factual] questions" such as length and circumstances of confinement and familiarity with Miranda warnings "are conclusive on the habeas court if fairly supported in the record").

In its "conclusions of law," the suppression court began by remarking that "over and beyond the ordinary constitutional safeguards provided for adults subjective to questioning, police must exercise greater care to enure the rights of youthful suspects are observed." H. 173. But it also recognized that "a minor is still capable of waiving his or her Miranda rights," and found that "there is no evidence in this case that [petitioner] was mistreated or threatened, and he indicated that he was voluntarily waiving his Miranda rights on several occasions." H. 173. The court specifically found that petitioner "was over 16 years of age," that "[p]olice were under no obligation to contact his legal guardian,." that "[t]here was no evidence that [petitioner] [asked] to speak to his guardian before speaking to the police or that the police used deception or trickery

---

[2] The suppression court also made findings with respect to the line-up. It found that five individuals had an opportunity to view the lineup, three of whom made no identification. Of the two who did identify petitioner, one said he recognized petitioner "from the homicide," and the other said, "from the club." H. 167. By the time of trial, both these witnesses were missing, but in response to petitioner's request for a missing witness charge, the trial court allowed an officer to testify to the line-up results.

4

to isolate [petitioner] from his family." H. 173. The court further found that petitioner was "competent to waive his rights to counsel in the absence of counsel." H. 174. With respect to the post-Miranda statement, the court noted that "[t]here is no testimony that any promises were made or threats made to [petitioner]," and concluded that "[t]here is no testimony or evidence from which the court can conclude that the statement was not voluntarily given." H. 175.

Although not part of the suppression court's findings, Detective Arthur also testified at the hearing that petitioner was allowed to use the restroom, that he requested and was given a soda at 10:00 p.m., and consumed a hamburger, fries and a soda at 12:45 a.m., less than an hour before Miranda warnings were administered. H. 59. The court's findings did not address Arthur's testimony that petitioner's demeanor at the time he was read his rights was "normal for a person that is not under the influence, not overly tired, not drunk," and that petitioner seemed to understand what Arthur was saying. H. 56.

On this application, petitioner does not dispute the findings of the suppression court but instead relies on additional facts revealed for the first time at trial, through a more thorough cross-examination of Detective Arthur than was conducted at the hearing. Petitioner argues that these facts describe a sequence of events that rendered his confession the product of coercion rather than a knowing and voluntary waiver of his right against self-incrimination.[3]

This claim requires assessment of the "totality of the circumstances." Arizona v.Fulminante, 499 U.S. 279, 2862-89 (1991). The "totality of the circumstances" on a

---

[3] Petitioner does not appear to contend that his initial statement "let the cat out of the bag," and any such contention would be entirely foreclosed by Oregon v. Elstad, 470 U.S. 298, 310-311 (1985) and Missouri v. Seibert, 542 U.S. 600, 605-11(2004), in which the Court expressly rejected the "cat out of the bag" theory except in the rare situation, not present here, where the police have elicited a complete confession before administering Miranda.

5

voluntariness challenge includes "the entire course of police conduct with respect to the suspect," Oregon v. Elstad, 470 U.S. at 318, as well as the "relevant characteristics of the individual who confessed." Green v. Scully, 850 F.2d 894, 902 (2d Cir.), cert. denied, 488 U.S. 945 (1988). This highly "fact-specific" inquiry, Tankleff v. Senkowski, 135 F.3d 235, 245 (2d Cir. 1998), looks at "the place where an interrogation is held," "the length of detention," the "presence or absence of counsel," whether there was "physical mistreatment such as beatings, or long restraint in handcuffs," and whether other physical needs (food, water, sleep and use of the restroom) were met. Green v. Scully, 850 F.2d at 902 (internal citations omitted).

At petitioner's trial, Arthur revealed, for the first time, that between the time of petitioner's initial statement at 7:15 p.m. and the administering of Miranda at 1:30 a.m., he had twice questioned petitioner, in two brief, separate sessions in the interview room located in the squad area. T. 106. The first was at approximately 8:00 p.m. Petitioner "was handcuffed when [Arthur] brought him from the cell area" to the interview room, and "once in the room, [Arthur] put more cuffs around his hand," and cuffed him to the chair. T. 106, 147. Arthur was alone with petitioner when he began to question him by asking his name. T. 106. Petitioner replied with a false name. T. 106. Arthur told petitioner to stop lying, that he knew his name, age, where he lived, and everything about him. He then told petitioner he would talk to him again in a little while and took him back to his cell. T. 106.

Arthur brought petitioner back to the interview room about an hour later and again cuffed him to a chair. T. 147, 151-52. He asked petitioner questions about where he went to school and what he described as "regular small talk questions" and "pedigree information mostly," and again returned him to his cell. T. 108, 153

Arthur admitted that the entire process—removing petitioner from his cell, returning him to his cell, and telling him he knew everything about him—was intended to get petitioner to make a statement. T. 149. While petitioner was in the cell, Arthur was attending to paperwork. The third time Arthur brought him to the interview room was after the line-up, at approximately 1:30 a.m., when he again cuffed him to a chair and then read him his <u>Miranda</u> rights. T. 108,162. Arthur then "let [petitioner] sit there for a little while" after being read his rights, alone in the interview room, still cuffed to the chair. T. 162. The interview during which the two-page confession was taken lasted almost two hours, from 1:50 a.m. to 3:30 a.m. T. 126, 165. Arthur began the session by telling petitioner that he had been picked out of the line-up, and then started asking him about his whereabouts on the night in question. T. 165. Arthur did not tell petitioner how many people had identified him or that three of the people who looked at the lineup did not identify him. T. 171.

Trial counsel moved to dismiss the charges at the close of the People's case based in part on the unreliability and involuntariness of the confession, T. 314-18, but did not move to reopen the suppression hearing. The issue of voluntariness was submitted to the jury, which was instructed to disregard the confession if they found it was involuntarily made. T. 397-98. Petitioner does not challenge the accuracy of the court's voluntariness instruction. In summation, petitioner's counsel asked the jury to consider the totality of the circumstances and conclude that, despite the <u>Miranda</u> waiver, petitioner's statements were not voluntarily made. T. 340-49.[4]

---

[4] In New York, a defendant who has received an adverse ruling at his suppression hearing is authorized, by statute, to attempt to establish at trial that his statement should be disregarded by the trier of fact on the ground that it was involuntarily made. N.Y. C.P.L. § 710.70. If, however, counsel fails to move at trial to reopen the suppressing hearing, the Appellate Division is barred from considering the trial evidence in reviewing whether a confession was properly

Construed liberally on this pro se petition, petitioner's arguments identify as factors tending to negate a finding of voluntariness the following: his age; his lack of criminal history; the absence of counsel or a guardian (although there was no evidence that he asked to speak with either);[5] the administering of his <u>Miranda</u> warnings after eight full hours in custody; the two sessions of pre-<u>Miranda</u> questioning in the interview room; the use of handcuffs to restrain him to a chair during the three questioning sessions; and the length (almost two hours) of the interrogation that produced the confession.[6]

Nevertheless, a bona fide assessment of the required "totality of the circumstances" must preclude considering factors in isolation, in the abstract, or divorced from the reality established

---

suppressed, even when there is a discrepancy between the testimony adduced at the hearing and at trial. People v. Lewis, 758 N.Y.S.2d 1 (App. Div. 2003); People v. Andujar, 700 N.Y.S.2d 480 (App. Div. 1999). Here, although it appears that the Appellate Division expressly affirmed only the decision of the *hearing* court not to suppress petitioner's confession, see People v. Williams, 756 N.Y.S.2d at 500, the trial record on voluntariness is nonetheless properly before this Court: (i) petitioner sought to dismiss the charges at the close of the evidence in part on the grounds that the confession was involuntary; (ii) counsel argued lack of voluntariness to the jury; (iii) petitioner's appellate brief argued voluntariness to the Appellate Division in terms of the "totality" of circumstances and relied heavily on trial testimony, and (iv) the Appellate Division's affirmance of the conviction declares petitioner's "remaining contentions" to be "unpreserved for appellate review or without merit," which must be read as rejecting the full voluntariness claim on the merits for purposes of AEDPA deference. Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006), cert. denied, __ U.S.__, 127 S.Ct. 976 (2007).

[5] To the extent petitioner may have been represented on another, unrelated matter, the People had no obligation to contact that attorney before speaking to his client about the social club murder. See McNeil v. Wisconsin, 501 U.S. 171, 175- 76 (1991) (because Sixth Amendment right to counsel is "offense specific," statements regarding offenses for which defendant had not yet been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses).

[6] Arthur's testimony does not address when the handcuffs were first placed on petitioner. He stated only that petitioner was cuffed "when he brought him from the cell area to the [interview] room," after which he "put more cuffs" on him. T. 106. Arthur's testimony makes clear that petitioner was cuffed during each of the sessions of questioning, and not cuffed when back in his cell after the second of the three interview sessions. T. 156.

by the evidentiary record. See Green, 850 F.2d at 901-02 (factors "are not to be weighed against one another on a balance scale," and "[n]o single criterion controls"). Here, that record is devoid of any evidence even tending to suggest, despite the length of his confinement, the presence of cuffs on his wrists, or the other factors petitioner cites, that petitioner did not understand his Miranda rights when they were read to him, that he lacked the requisite level of comprehension to make an effective waiver of them, or that his confession was the product of an overborne will. See Innis, 446 U.S. at 299 (Miranda safeguards intended to address only the "interplay of interrogation and custody [that] would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination"). Despite petitioner's effort to sensationalize the length of his confinement and the use of handcuffs as some sort of smoking gun evidence concealed during the suppression hearing, the fact remains that the trial record does not alter the suppression court's conclusions, namely, that there is no evidence of threats, mistreatment, promises or deception by the police. H. 173-75. Indeed, at trial, Arthur confirmed that less than an hour before petitioner was read his rights, petitioner was furnished with a meal. T. 131-32. To the extent the duration of petitioner's detention and the use of handcuffs take center stage in petitioner's arguments as "measure[s] of compulsion above and beyond that inherent in custody itself," Innis, 446 U.S. at 300, the record reveals that neither of these factors succeeded in "subjugat[ing]" petitioner "to the will of" Detective Arthur, Miranda v. Arizona, 384 U.S. 436, 457 (1966), for petitioner apparently exercised his own will quite ably when he chose, during his two brief, pre-Miranda interviews, to lie to Detective Arthur about his name and age.

Likewise, with respect to petitioner's age, it is well established that petitioner's age alone

does not render him incompetent to make an effective Miranda waiver. See, e.g., Fare v. Michael C., 442 U.S. 707, 727-28 (1979); United States v. Burros, 147 F.3d 111, 116-17 (2d Cir.), cert. denied, 525 U.S. 939 (1998). In addition, nothing in the trial record provides a basis for disturbing the conclusion of the suppression court, which concluded that petitioner was competent to waive his right to counsel in the absence of counsel, and found no evidence that petitioner asked to speak to a guardian or that the police used deception or trickery to isolate him. H. 173-74.

In any event, despite the length of his confinement, petitioner was not subject to grueling, prolonged pre-Miranda questioning, but only to two quite brief interview sessions that terminated while still exploring pedigree matters and without the eliciting of a material statement. Those sessions alone, therefore, do not render petitioner's post-Miranda confession involuntary. See Harris v. Woods, 2006 WL 1140888 (S.D.N.Y. May 1, 2006) (Peck, M.J.), adopted, 2006 WL 1975990 (S.D.N.Y. July 10, 2006) (six hours in precinct before being given Miranda warnings did not render warnings ineffective because "almost all of that time" involved questions about crimes committed by suspect's friends). But see, United States v. Perez, 733 F.2d 1026 (2d Cir. 1984) (interpreting 18 U.S.C. § 3501 as authorizing court to suppress statement, on basis of delay alone, if confession made more than six hours after suspect first taken into custody). Likewise, the length of petitioner's post-Miranda interrogation (almost two hours) does not give rise to any presumption of coercion. See, e.g., Green v. Scully, 850 F.2d at 902 (duration of interrogation not coercive where interview lasted "for just over two hours"); United States v. Guarno, 819 F.2d 28, 31 (2d Cir.1987) (duration of interview lasting approximately two and a half hours not coercive).

IV.

The fact that petitioner's pre-trial motion did not make a sufficient showing to warrant a hearing on his Fourth Amendment claim does not amount to an "unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992). Therefore, his assertion that he was arrested without probable cause, and that his confession and line-up should have been suppressed as the fruit of an illegal arrest, are not cognizable in a habeas corpus proceeding. Stone v. Powell, 428 U.S. 465 (1976).

V.

Petitioner's claim that the trial court improperly allowed the admission of hearsay identification evidence does not present a federal question. Crane v. Kentucky, 476 U.S. 683, 689 (1986). In any event, petitioner is responsible for the trial court's admission of the evidence to which he now objects. The People, having apparently lost track of the two witnesses who identified petitioner in the lineup, did not even refer to the lineup in the their opening statements. Petitioner's counsel, however, pursued the issue by requesting a missing witness charge, which the court granted, but the court decided that the issues of whether the witnesses were under the People's control and available should be presented to the jury. The court therefore allowed an officer to testify to the prosecution's efforts to locate the witnesses and their materiality to the case. The admission of hearsay identification testimony triggered by petitioner's own trial strategy cannot form a basis of habeas relief, particularly where petitioner failed to make any objection at trial.

**CONCLUSION**

For all of the foregoing reasons, the application for relief is denied and the petition is

dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. In addition, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. <u>Coppedge v. United States</u>, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       July 3, 2008                              s/RJD

                                      RAYMOND J. DEARIE
                                      United States District Judge